***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before the Deputy Commissioner and the briefs and arguments of the parties before the Full Commission. Defendants have not shown good grounds to reconsider the evidence, and upon reconsideration, the Full Commission affirms with modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. At all relevant times, defendant-employer regularly employed three or more employees and was bound by the North Carolina Workers' Compensation Act. The employer *Page 2 
and the employee relationship existed between the employer and the employee on or about April 16, 2009, the date of the alleged onset of occupational disease to his right shoulder.
2. Defendants are entitled to a credit for all "net" A S benefits received by Plaintiff for any period of time for which he is claiming entitlement to disability benefits. The parties further stipulate that "net" A S benefits are defined as gross A S benefits less any taxes deducted from gross benefits.
3. Plaintiff's average weekly wage was $1,083.90, per week, yielding a weekly compensation rate for 2009 of $722.96.
4. The parties stipulated to the admissibility of the following documents, which were received into evidence:
 • Exhibit 1: Pre-Trial Agreement (Pages 1-4);
 • Exhibit 2: Industrial Commission Forms (Pages 1-8);
 • Exhibit 3: Medical Records (Pages 1-36);
 • Exhibit 4: Medical Bills Chart (Pages 1-10);
 • Exhibit 5: Average Weekly Wage Report (Page 1);
 • Exhibit 6: Job Description (Pages 1-4);
 • Exhibit 7: Plaintiff's Responses to Defendants' First Set of Interrogatories and Request for Production of Documents (Pages 1-26); and
 • Exhibit 8: Defendants' Response to Plaintiff's First Set of Interrogatories and Request for Production of Documents (Pages 1-41).
 ***********
Based upon the preponderance of the evidence of the record, the Full Commission makes the following: *Page 3 
 FINDINGS OF FACT
1. Plaintiff is forty-seven (47) years old, right hand dominant and weighed approximately 280 pounds. Plaintiff completed the tenth grade of high school.
2. On August 11, 1987, Plaintiff commenced work for defendant-employer as a tire sorter, a job which he performed for approximately seven years. A tire sorter removes tires from a conveyor line and stacks them in columns of seven to ten. Each truck tire weighs between 30 to 50 pounds.
3. In April 1994, Plaintiff became a stage II RLT truck tire builder, working 12 hour shifts, from 7:00 p.m. to 7:00 a.m., for three days, and then having three days off. The next week, Plaintiff would work two days, with two days off. Plaintiff rotated on this schedule throughout the year. Plaintiff made between 260 to 310 tires in a twelve hour shift. In Plaintiff's last position with defendant-employer, he worked on tire machine 2411, for approximately ten years.
4. As a stage II RTL truck tire builder, and as noted in the job summary, Plaintiff was required to frequently lift and carry up to 60 pounds from 56 inches, carry 10 feet and place at 64 inches and 24 inches; frequently pull and pinch ends of tread together; frequently lift and carry up to 25 pounds from 15 inches and 70 inches, carry 5 feet and place at 56 inches; grip and pinch bilaterally to position belt/band on building drum; frequently lift and carry up to 30 pounds from 24 inches and 84 inches, carry 10 feet and place at 40 inches; frequently pull up to 50 pounds at 84 inches and 24 inches to remove carcass from truck; occasionally lift and carry liner take up roll from 40 inches, carry 10 feet and place at 48 inches; occasionally lift 55 pounds from 64 inches and 24 inches, carry 10 feet and place at 20 inches; and occasionally push up to 100 pounds with another associate to move tread trap. *Page 4 
5. The functional job summary for a stage II RLT truck tire builder indicated that a worker must stand, walk, bend, and reach constantly, and frequently lift, carry, push, pull, grip, pinch, and bend.
6. Plaintiff testified at the hearing before the Deputy Commissioner that in approximately early 2009, while working as a stage II RLT truck tire builder, he began to experience right shoulder pain.
7. On January 10, 2009, Plaintiff was initially treated at Northside Urgent Care by Dr. Robert L. Ferguson, the Medical Director and an internist, with complaints of ongoing right shoulder pain that was worse with overhead use. Plaintiff was referred for an MRI of his right shoulder, which was scheduled for March 10, 2009.
8. The MRI report revealed inferior osteophyte formation at the level of the right acromioclavicular joint and the lateral aspect of the acromion process of the right scapula, signal changes of tendinopathy were present within the lateral aspect of the right supraspinatus tendon, an ovoid area of fluid signal was noted in the soft tissues anterior to the right shoulder, this is in the region of the right subscapularis bursa, which may represent right subscapularis bursitis.
9. At a follow up visit with Northside Urgent Care on April 6, 2009, Plaintiff was referred to an orthopedic surgeon.
10. On April 16, 2009, Plaintiff presented to Dr. Douglas S. McFarlane, an orthopedic surgeon with Cape Fear Orthopaedic Clinic, with complaints of right shoulder pain. Dr. McFarlane recorded that Plaintiff was a tire builder with defendant-employer and is constantly lifting and performing repetitive work with both arms, but more frequently with the right arm as he is right-hand dominant. *Page 5 
11. Dr. McFarlane's medical record reflects that Plaintiff's right shoulder revealed fairly full range of motion; however, the extremes of abduction and rotation do cause some pain. Dr. McFarlane opined that Plaintiff suffered from an impingement syndrome, administered a cortisone injection in Plaintiff's right shoulder and referred Plaintiff for physical therapy. The steroid injection only provided limited relief from Plaintiff's right shoulder pain. Dr. McFarlane's medial record opines that Plaintiff's right shoulder impingement syndrome has been certainly contributed to if not caused by the type of work that he does.
12. On May 28, 2009, Plaintiff again presented to Dr. McFarlane at which time Plaintiff reported that his work is a constant aggravation to his shoulder and his neck. Plaintiff also reported that halfway through his shift he starts to have problems and by the end he is experiencing significant pain. Dr. McFarlane noted that Plaintiff does not have many alternatives because he does not wish to quit his job and is not aware of lighter work at the plant for which he would be qualified. Dr. McFarlane gave a second cortisone injection into Plaintiff's right shoulder and again referred him for physical therapy.
13. On March 5, 2010, Plaintiff was evaluated by Dr. Peter Dalldorf, an orthopedic surgeon with Guilford Orthopaedic and Sports Medicine Center, with the complaint of experiencing right shoulder pain for approximately one year. Dr. Dalldorf noted that Plaintiff is a tire builder and works in his job with difficulty. Dr. Dalldorf's medical record reflects that Plaintiff has been well treated for an "impingement which I think is to a great deal related to what he has to do for a living." After reviewing an MRI and x-rays, Dr. Dalldorf opined that Plaintiff had a right shoulder chronic impingement and recommended an arthroscopy of the right shoulder. Dr. Dalldorf also noted that Plaintiff had a type III acromion, which was a particular shape to the shoulder with which Plaintiff was born. Dr. Dalldorf testified in his deposition that *Page 6 
this can lead to rotator cuff problems, particularly with the repetitive nature of Plaintiff's work. Dr. Dalldorf opined that the partial thickness tearing under the right rotator cuff was related to Plaintiff's work duties.
14. On March 21, 2010, Plaintiff stopped working in order to undergo surgery in Greensboro, North Carolina by Dr. Dalldorf, performed on March 25, 2010. Dr. Dalldorf opined that this was reasonable.
15. On March 25, 2010, Dr. Dalldorf performed the right shoulder arthroscopy and noted that the glenohumeral joint showed no degenerative changes and the biceps tendon and rotator cuff appeared benign, but that there was a partial thickness tear of the cuff in the subacromial space.
16. On April 7, 2010, Plaintiff returned to Dr. Dalldorf, at which point his sutures were removed, and his out of work restrictions were continued. Plaintiff was continued on Percocet, and was given some home exercises. At this visit, Dr. Dalldorf opined that Plaintiff may be out of work for two or even three months due to his surgery.
17. On May 26, 2010, Plaintiff returned to Dr. Dalldorf, with continued pain with overhead movement. Dr. Dalldorf refilled Plaintiff's prescription of Percocet and continued to restrict Plaintiff from working.
18. Dr. Dalldorf opined during his deposition to a reasonable degree of medical certainty that Plaintiff's job duties as a stage II RLT truck tire builder placed him at an increased risk of developing the right shoulder chronic impingement syndrome. Dr. Dalldorf further opined that Plaintiff's job duties were a significant contributing factor in the development of Plaintiff's right shoulder chronic impingement syndrome. *Page 7 
19. At the time of Dr. Dalldorf's deposition on June 9, 2010, Plaintiff had not yet reached maximum medical improvement.
20. Based on the preponderance of the evidence of the record, the Full Commission finds that Plaintiff's job duties, which required significant amounts of shoulder-level-and-above work with his right arm, placed him at an increased risk for developing impingement syndrome and the rotator cuff tear in his right shoulder as compared with members of the general public not equally exposed.
21. Based on the preponderance of the evidence of the record, the Full Commission further finds that Plaintiff's job as a stage II truck tire builder was a significant contributing factor in the development of the chronic impingement syndrome and rotator cuff tear in his right shoulder.
22. The Full Commission finds that Dr. Dalldorf's medical treatment was reasonably necessary to effect a cure, provide relief, or lessen the period of disability.
23. The Full Commission finds that as of the date of the Dr. Dalldorf's deposition on June 9, 2010, Dr. Dalldorf opined that Plaintiff had not yet reached maximum medical improvement. The Full Commission further finds as of the date of the hearing before the Deputy Commissioner, Plaintiff had not yet been released to return to work by Dr. Dalldorf.
24. The Full Commission finds that if Plaintiff has returned to work for Defendant-Employer, then Defendants would be entitled to a credit for any disability payments made after Plaintiff's return to work date.
25. The parties stipulated that Defendants are entitled to a credit for all "net" A S benefits received by Plaintiff for any period of time for which Plaintiff is claiming entitlement to *Page 8 
disability benefits. The parties further stipulated that "net" A S benefits are defined as gross A S benefits less any taxes.
26. Defendants appealed the Deputy Commissioner's Opinion and Award, and the Full Commission affirms said decision.
 ***********
Based upon the foregoing Stipulations, and Findings of Fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. In order to establish an occupational disease under N.C. Gen. Stat. § 97-53(13), a claimant must show that the employment exposed him to a greater risk of contracting the disease than the public generally. Rutledge v. Tultex Corp.,308 N.C. 85, 301 S.E.2d 359 (1983). In addition, the claimant must show that the employment significantly contributed to, or was a significant causal factor in, the disease's development.Hardin v. Motor Panels, Inc.,136 N.C. App. 351, 524 S.E.2d 368 (2000) (citing Rutledge v.Tultex Corp., 308 N.C. 85, 301 S.E.2d 359 (1983). As a result of the nature of his job duties as truck tire builder for Defendant-Employer, which required a significant amount of shoulder-level-and-above work with the right arm, Plaintiff developed right shoulder impingement syndrome and a rotator cuff tear. Plaintiff's job duties with Defendant-Employer placed him at an increased risk of developing right shoulder impingement syndrome and right rotator cuff tear than members of the general public not so employed. Plaintiff's right shoulder impingement and rotator cuff tear were caused or significantly contributed to by his job duties with Defendant-Employer.
2. As a direct and proximate result of his occupational disease of shoulder impingement syndrome and a right rotator cuff tear, Plaintiff was unable to earn the same or any *Page 9 
other wages from March 21, 2009 until he reaches maximum medical improvement. Plaintiff is entitled to temporary total disability compensation in the amount of $722.96 per week for the time period of March 21, 2009 until Plaintiff returns to work. N.C. Gen. Stat. § 97-29. Defendants would be entitled to a credit for any temporary total disability benefits received by Plaintiff after his return to work. N.C. Gen. Stat. § 97-42.
3. Defendants are entitled to a credit for all net A S benefits received by Plaintiff for the time he is entitled to temporary total disability benefits, pursuant to the terms contained in N.C. Gen. Stat. § 97-42 for disability payments made to Plaintiff. N.C. Gen. Stat. § 97-42.
4. As a direct and proximate result of Plaintiff's occupational disease of shoulder impingement syndrome and a right rotator cuff tear, Plaintiff is entitled to all medical expenses incurred or to be incurred for his right shoulder, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen Plaintiff's period of disability. N.C. Gen. Stat. §§ 97-2(19), 97-25.
5. In the discretion of the Full Commission, counsel for Plaintiff is entitled to have Defendants pay an attorney's fee in addition to the amount awarded as a percentage of Plaintiff's compensation. N.C. Gen. Stat. § 97-88.
 ***********
Based upon the foregoing Stipulations, Findings of Fact, and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Subject to an attorney's fee hereinafter approved, Defendants shall pay ongoing temporary total disability compensation to Plaintiff at the rate of $722.96 per week from March 21, 2009 until such time as Plaintiff returns to work. Defendants shall be entitled to a credit for *Page 10 
all temporary total disability benefits received by Plaintiff after his return to work. The parties shall confer to determine the date upon which Plaintiff returned to full duty work pursuant to the business records of the Defendant-Employer.
2. Defendants are entitled to a credit for all net A S benefits received by Plaintiff for the time Plaintiff is entitled to temporary total disability benefits, pursuant to the terms contained in N.C. Gen. Stat. § 97-42 for disability payments made to Plaintiff. N.C. Gen. Stat. § 97-42.
3. Defendants shall pay all past and future medical expenses incurred or to be incurred as a result of Plaintiff's occupational disease of shoulder impingement syndrome and a right rotator cuff tear, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen Plaintiff's period of disability.
4. A reasonable attorney's fee in the amount of twenty-five percent (25%) of the compensation due Plaintiff under Paragraph One of this Award is approved for Plaintiff's counsel and shall be paid by Defendants as follows: twenty-five percent of any compensation which has accrued shall be paid directly to Plaintiff's counsel. Thereafter, every fourth compensation check shall be paid directly to Plaintiff's counsel.
5. Plaintiff's counsel shall submit to the Commission an affidavit of time spent defending the appeal to the Full Commission, with a distinction made between attorney time and paralegal time. The affidavit may be submitted directly to Abigail M. Hammond, Law Clerk to Pamela T. Young, Chair, with a copy to opposing counsel.
6. Defendants shall pay the costs.
This the __ day of June 2011. *Page 11 
 S/___________________ PAMELA T. YOUNG CHAIR
CONCURRING:
 S/___________________ LINDA CHEATHAM COMMISSIONER
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER *Page 1